## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JERRI MACRI, *et al.*,

      Plaintiffs,

            v.

JAMES BROWER, *et al.*,

      Defendants.

Civil Action No.
1:21-cv-03240-SDG

## <u>OPINION AND ORDER</u>

This case stems from the criminal investigation and 2014 arrests on felony commercial gambling charges of Plaintiffs Jerry Macri, Danny White, Zachary White, Alicia White, and Rebecca Macri, for conduct that did not, in fact, constitute the crime of commercial gambling. Defendants James Brower, Shane Mims, and Gene Scarbrough are all law enforcement officers who were purportedly involved in the investigation and arrests. Plaintiffs asserted claims under Section 1983 for violations of their Fourth and Fourteenth Amendment rights (Count I); for attorneys' fees under Section 1988 (Count II); for state-law conversion (Count III); and for punitive damages (Count IV).[1] Defendants deny liability[2] and argue that they are entitled to qualified immunity.[3] At the pleading stage, the Court

---

[1]  ECF 12.

[2]  *See generally* ECFs 24–25.

[3]  ECF 24, Second Defense ¶ 2; ECF 25, Third Defense.

dismissed the state-law claims as to Brower but allowed all remaining claims against Brower and the other defendants to proceed.[4]

The parties' cross-motions for summary judgment are now before the Court. Those motions largely turn on whether Defendants should have known the applications for the warrants for Plaintiffs' arrests lacked probable cause, or whether Defendants made material misstatements or omitted material information in the applications. The answer largely depends on disputed facts that must be decided by a jury. Accordingly, having considered the parties' briefing and with the benefit of oral argument, the Court (1) **DENIES** Plaintiffs' motion for partial summary judgment [ECF 77];[5] (2) **GRANTS in part and DENIES in part** Mims and Scarbrough's motion for summary judgment [ECF 79]; (3) **GRANTS in part and DENIES in part** Brower's motion for summary judgment [ECF 81]; and (4) **GRANTS** Brower's motion for leave to file under seal [ECF 83].

## I. Factual Background

Since this Order addresses three separate summary judgment motions, and disputed material facts must be viewed in the light most favorable to the parties opposing a particular motion, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

---

[4]   ECF 23.

[5]   Plaintiffs seek summary judgment only as to their malicious prosecution claims against Brower and Mims. *See generally* ECF 77.

(1986); *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999), this section describes those facts as to which all parties agree (or, at least, do not object). Inferences and presumptions in favor of a particular party are discussed in connection with the individual motions.

### A.    The Parties

During the relevant period—2013 and 2014—Plaintiff Jerry Macri was married to Rebecca Macri.[6] Plaintiff Danny White was Zachary White's father.[7] Danny died during this litigation and Dalthea Jo Ford, in her capacity as the executor of his estate, was substituted as a Plaintiff.[8] Plaintiff Alicia White was known as Alicia Lamb and was dating Zachary (whom she later married).[9]

At all times relevant to this litigation, Defendant James Brower was a special agent with the Georgia Bureau of Investigation's Commercial Gambling Unit.[10] As part of his employment with the GBI, in August 2013, Brower began to assist the Mid-South Narcotics Task Force (the Task Force).[11] The Task Force included law

---

[6]    ECF 85-1, ¶ 37; ECF 86, ¶ 37.

[7]    ECF 85-1, ¶ 31; ECF 86, ¶ 31.

[8]    May 9, 2023 D.E. For ease of reference, this Order refers to the party as Danny.

[9]    ECF 85-1, ¶¶ 33–34; ECF 86, ¶¶ 33–34.

[10]    ECF 81-2, ¶¶ 1–2; ECF 85-1, ¶ 3.

[11]    ECF 81-2, ¶¶ 22, 24.

enforcement officers from Crisp, Turner, and Tift Counties in Georgia.[12] Defendant Shane Mims was a member of the Task Force and a Tift County deputy sheriff.[13] Defendant Gene Scarbrough was the Sheriff of Tift County.[14] During his 2012 election campaign, Scarbrough received complaints from people in the county about illegal cash payouts on coin operated amusement machines.[15] He spoke with the district attorney, who told Scarbrough that he (the DA) would prosecute such crimes.[16] Thereafter, the commander of the Task Force (Jeff Youngblood) directed Mims to begin investigating such activity.[17]

Beyond those details, the parties disagree about nearly every salient fact — Scarbrough's involvement with the Task Force, the investigation and arrests of Plaintiffs, Defendants' motives. Plaintiffs argue that the investigation took place at Scarbrough's behest because people in the community were upset about the money Jerry and Danny were making from the machines.[18] Plaintiffs also suggest that Youngblood reported to Scarbrough, but Mims and Scarbrough dispute that.[19]

---

[12]   ECF 81-2, ¶ 23; ECF 85-1, ¶ 4; ECF 86, ¶ 4.

[13]   ECF 79-1, ¶ 8; ECF 85-1, ¶ 2; ECF 86, ¶ 2.

[14]   ECF 79-1, ¶ 8.

[15]   ECF 79-1, ¶ 10.

[16]   ECF 79-1, ¶ 11.

[17]   ECF 79-1, ¶ 12.

[18]   ECF 90-1, ¶ 158.

[19]   ECF 85-1, ¶ 7.

For his part, Brower agrees with Plaintiffs that Mims reported to Youngblood and that Youngblood reported to Scarbrough.[20]

### B.   Coin Operated Amusement Machines

#### 1.   COAMs and Gambling Crimes

Under Georgia law, "bona fide coin operated amusement machines" (COAMs) are amusement machines the operation of which requires some level of player skill. O.C.G.A. § 50-27-70(b)(2)(A). Pinball machines, video games, and claw machines are examples. *Id.* COAMs are subject to a detailed statutory scheme under the Georgia Code,[21] so the Court discusses the relevant provisions only to the extent necessary to resolve the parties' motions. The owner of a COAM must hold a master license issued by the State of Georgia and is known as the master licensee. *Id.* § 50-27-70(b)(10), (13). A "location owner" is the business where the COAM is made available to be used by the public and COAMs can only be placed in the business of a licensed location owner. *Id.* §§ 50-27-70(b)(8), 50-27-87(a)(2). For a COAM to be placed with a location owner, there must be a written agreement between the master licensee and the location owner. *Id.* §§ 50-27-87(b)(1), (b)(3)(A).

---

[20]   ECF 86, ¶ 7.

[21]   *See, e.g.*, *Gebrekidan v. City of Clarkston*, 298 Ga. 651, 656, 657 (2016) (describing the COAM statutory scheme as "extensive" and a "comprehensive general law" and COAMs as "comprehensively regulated"; noting that the COAM laws fill "more than 35 pages of the Georgia Code").

The master licensee cannot have an interest in the business of a location owner and a location owner cannot hold a master license or have an immediate family member who holds one. *Id.* §§ 50-27-87(a)(4), (b)(1). Proceeds from the COAMs are split between the master licensee and the location owner, after the Georgia Lottery Commission receives a percentage. *Id.* § 50-27-102 (indicating location owners and master licensees each receive 43.5% of the net receipts of the COAMs).

The section of the Georgia Code dealing with criminal gambling offenses (Title 16, Chapter 12, Article 2, Part 1) expressly does not apply to COAMs that reward the player with free replays, points, tokens, tickets, vouchers, or merchandise worth less than $5.00. *Id.* §§ 16-12-35(b), (d)(1). Giving a person money for rewards earned by playing a COAM is a misdemeanor. *Id.* § 16-12-35(e)–(g). Commercial gambling—the crime with which all Plaintiffs were charged—is committed when a person "***intentionally*** . . . [o]perates or participates in the earnings of a gambling place." *Id.* § 16-12-22(a)(1) (emphasis added). A gambling place is a location for which one of the principal uses is the playing of gambling devices. *Id.* § 16-12-20(3). Commercial gambling is a felony, punishable by up to five years in prison and a $20,000 fine. *Id.* § 16-12-22(b).

### 2.   The Machines and Defendants' Theory of the Crimes

Jerry and Danny co-owned M&M Amusements (M&M), the master licensee for about 200 COAMs (the Machines) that were at the heart of the criminal charges

brought against Plaintiffs.[22] The Machines were in various convenience stores and businesses in and around Tifton.[23] M&M would collect funds from the Machines every week or two.[24] The Machines were the kind expressly exempted from the Georgia Code's criminal gambling offenses.[25]

During the relevant period, Brower and Mims understood that, if customers received cash payouts for credits they won on COAMs, the machines became illegal gambling devices and the business where the machines were located became illegal gambling places.[26] Correspondingly, they believed that a person engaged in illegal commercial gambling by intentionally participating in the earnings of a business that owned the COAMs on which such cash payouts were made (*i.e.*, the master licensee).[27] Plaintiffs argue that this interpretation was

---

[22]   ECF 81-2, ¶¶ 28, 30; ECF 85-1, ¶ 24; ECF 86, ¶ 24. The parties disagree whether the company name was changed at some point to M&W Amusements. *See, e.g.*, ECF 81-2, ¶ 29; ECF 85-1, ¶ 24. That dispute is immaterial for present purposes and this Order refers to the business as M&M throughout.

[23]   ECF 85-1, ¶¶ 24–25.

[24]   ECF 86, ¶ 30.

[25]   ECF 85-1, ¶ 27 & ECF 86, ¶ 27 (indicating the master license applicable to the Machines was Class B). Class B COAMs are exempt from the crimes defined in Title 16, Chapter 12, Article 2, Part 1 of the Georgia Code. O.C.G.A. §§ 16-12-35(d)(1)–(2), 50-27-70(b)(4).

[26]   ECF 81-2, ¶ 17; ECF 85-1, ¶¶ 53–54; ECF 86, ¶¶ 53–54.

[27]   ECF 81-2, ¶ 18; ECF 85-1, ¶¶ 53–54; ECF 86, ¶¶ 53–54.

plainly wrong and never legally viable[28]—a point they contend was later confirmed by the Georgia Court of Appeals.[29] But Plaintiffs seem to concede that it was, in fact, Brower's and Mims's actual understanding at the time.[30]

Mims read both the commercial gambling and COAM statutes, and Brower helped Mims understand them.[31] Brower explained that anyone who benefitted from the proceeds of a commercial gambling operation was guilty of commercial gambling.[32] Brower and Mims worked with each other to develop their understanding of COAMs becoming gambling devices and businesses becoming illegal gambling places if cash payouts were made.[33] Because of Plaintiffs' alleged connections to Machines on which cash payouts were made (more on that below),

---

[28]  *See generally* ECF 91, at 15–22.

[29]  *Bartlett v. Georgia*, 351 Ga. App. 476 (2019), *reconsideration denied* (July 15, 2019), *certiorari denied* (Ga. Mar. 26, 2020) (reversing commercial gambling conviction based on the theory that COAMs should be treated as illegal gambling devices when cash payments are made to players). *See also id.* at 483 ("Nowhere in O.C.G.A. § 16-12-35 does the General Assembly provide that a cash payout would convert an otherwise legal COAM into an illegal 'gambling device' that would have subjected" the defendant to prosecution under O.C.G.A. §§ 16-12-22, -23, or -24).

[30]  ECF 85-1, ¶¶ 51–55; ECF 86, ¶¶ 51–55.

[31]  ECF 85-1, ¶¶ 20–21, 52; ECF 86, ¶¶ 21–22, 52.

[32]  ECF 85-1, ¶ 22.

[33]  ECF 85-1, ¶¶ 52–53; ECF 86, ¶¶ 52–53.

Brower and Mims assert that there was a basis to arrest them for commercial gambling.[34]

### C.    The Criminal Investigation

Although his primary experience was in narcotics, Mims had worked on a handful of cases involving COAMs before investigating Plaintiffs. In those cases, the owners of the COAMs were not charged, just the location owner or operator (*i.e.*, the person who made the cash payment).[35] According to Mims, he relied on Brower's expertise in gambling investigations.[36] Brower says he "consulted" with Mims and provided Mims with his (Brower's) understanding of the commercial gambling statutes.[37] This was the first case Brower investigated after joining the GBI's Commercial Gambling Unit.[38] When Brower began assisting the Task Force, Mims provided him with information about the then-ongoing investigation into alleged commercial gambling by Jerry and others.[39] The parties dispute what information Mims conveyed to Brower and the accuracy of that information.[40]

---

[34] *See, e.g.*, ECF 85-1, ¶¶ 51, 54; ECF 86, ¶¶ 51, 54.

[35] ECF 85-1, ¶ 8.

[36] ECF 85-1, ¶ 12.

[37] ECF 86, ¶ 52.

[38] ECF 85-1, ¶ 16; ECF 86, ¶ 16.

[39] ECF 81-2, ¶ 25; ECF 90-1, ¶ 25.

[40] ECF 91-1, ¶ 25.

The parties also dispute the extent of Brower's involvement in the investigation (including his participation in undercover operations) but agree that he gathered financial information and licensing and business records related to Plaintiffs.[41] For instance, he obtained records showing that Alicia and Zachary had a joint bank account and records related to Alicia's ownership of a business called the Lucky Shamrock.[42] Brower was also involved in the execution of various search and arrest warrants.[43]

Par for the course, the parties disagree about what the investigation uncovered. It did reveal that Jerry, Danny, and Zachary collected M&M's proceeds from the various Machines.[44] There is disagreement whether Zachary was an employee of M&M but the parties agree that he received money from his father (Danny) for performing various chores and work, including collecting the Machine proceeds.[45] In April 2014, Rebecca deposited five separate checks of $460 each that were drawn on an M&M account.[46]

---

[41]   ECF 91-1, ¶ 31.

[42]   ECF 81-2, ¶¶ 43–44, 50; ECF 91-1, ¶¶ 44–45.

[43]   ECF 91-1, ¶¶ 31.

[44]   ECF 85-1, ¶¶ 30, 32; ECF 86, ¶¶ 30, 32.

[45]   ECF 85-1, ¶¶ 31–32; ECF 86, ¶ 31.

[46]   ECF 85-1, ¶ 59; ECF 86, ¶ 59.

### D.   Arrest and Prosecution

On July 6, 2014, Mims applied for arrest warrants for Jerry, Danny, Zachary, Alicia, and Rebecca for engaging in commercial gambling.[47] Pursuant to those warrants, each Plaintiff was arrested on July 7.[48] On July 11, Mims executed eight more arrest warrants for Jerry and for Danny, and seven more for Zachary, all for commercial gambling.[49] In terms of property, Plaintiffs do not dispute that Mims only personally seized (1) the vehicle in which Jerry and Danny were riding at the time of their arrest (including the contents of the vehicle) and (2) items from Danny's home.[50] Other property was sought to be seized pursuant to a warrant,[51] but it is unclear what the Task Force ultimately took possession of.

On July 15, 2014, Plaintiffs were indicted on charges of commercial gambling and conspiracy to commit commercial gambling.[52] In June 2020, the district attorney for the Tift Judicial Circuit announced that he would not continue the prosecution against Plaintiffs based on a Georgia Court of Appeals decision,

---

[47]   ECF 77-3, at 9; ECF 77-4, at 9; ECF 77-5, at 8; ECF 77-6; ECF 77-7.

[48]   ECF 81-2, ¶ 65; ECF 85-1, ¶ 38.

[49]   ECF 77-3, at 1–8; ECF 77-4, at 1–8; ECF 77-5, at 1–7; ECF 81-2, ¶ 73; ECF 85-1, ¶ 39.

[50]   ECF 90-1, ¶ 160.

[51]   ECF 77-12.

[52]   ECF 81-2, ¶ 81.

*Bartlett v. Georgia*, 351 Ga. App. 476 (2019).[53] *Bartlett* made clear that the interpretation of the gambling and COAM statutes applied by Brower and Mims was wrong. Hotly contested is the existence of probable cause for issuance of each of the 28 arrest warrants.[54]

## II.   Applicable Legal Standards

### A.   Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All "justifiable inferences" are drawn in favor of the opposing party. *Id.* at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson*, 477 U.S. at 255.

### B.   Malicious Prosecution and Qualified Immunity

Malicious prosecution claims are grounded in the Fourth Amendment because an arrest made without probable cause is an unreasonable seizure. *Butler*

---

[53]   ECF 81-2, ¶ 83.

[54]   *See infra* Section III.A.3.

*v. Smith*, 85 F.4th 1102, 1111–12 (11th Cir. 2023); *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019). But surviving summary judgment on such a claim is no easy feat for a plaintiff. Specifically, the plaintiff must prove the elements of the common-law malicious prosecution tort: (1) a criminal prosecution instituted or continued by the defendant; (2) without probable cause; (3) that terminated in the plaintiff's favor; and (4) caused damage to the plaintiff. The plaintiff must also establish a Fourth Amendment violation by showing that: (5) the legal process justifying the seizure was constitutionally infirm and (6) the seizure was not otherwise justified without legal process (that is, without a warrant). Finally, to overcome the defendant's assertion of qualified immunity, the plaintiff must show that the (7) constitutional right he contends was violated was clearly established. *Butler*, 85 F.4th at 1111–12 (citing *Paez*, 915 F.3d at 1285; *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir. 2020)).

There is "significant overlap" between the second factor (whether there was probable cause) and fifth factor (whether the legal process was constitutionally infirm), so they are analyzed together. *Id.* at 1112. As a result, a plaintiff can show the arrest warrant was constitutionally deficient because the officer who applied for the warrant (1) should have known that the application did not establish probable cause or (2) intentionally or recklessly made misstatements or omissions necessary to support probable cause. *Id. See also Haire v. Thomas*, 219 F. App'x 844,

846 (11th Cir. 2006) (per curiam) (citing *Franks v. Delaware*, 438 U.S. 154, 155 (1978); discussing the second standard). The Eleventh Circuit has long "recognized a federal right to be free from 'prosecutions procured by false and misleading information.'" *Kelly v. Curtis*, 21 F.3d 1544, 1549 (11th Cir. 1994) (quoting *Strength v. Hubert*, 854 F.2d 421, 425 (11th Cir. 1988)).

For purposes of qualified immunity and assessing whether the relevant constitutional right was clearly established, the Court must determine whether "a reasonable official would understand that what he is doing violates that right." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (citing *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1327 (11th Cir. 2006)). Cases from the United States Supreme Court, Eleventh Circuit, and Georgia Supreme Court establish whether the law, at the time of the violation, provided "fair and clear warning" to a reasonable officer that his actions were unconstitutional. *Id.*; *see also Washington v. Rivera*, 939 F.3d 1239, 1245 (11th Cir. 2019) (citing *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003)). Specific to Plaintiffs' malicious prosecution claims, what must have been clearly established is the *type of defect in the warrant*—the obvious lack of probable cause or the intentional or reckless making of false statements. *Butler*, 85 F.4th at 1112.

## III.   Defendants' Motions for Partial Summary Judgment

For purposes of Defendants' summary judgment motions, the Court views the evidence in the light most favorable to Plaintiffs. *Anderson*, 477 U.S. at 255;

*Herzog*, 193 F.3d at 1246. In considering each of the summary judgment motions, it is critical to analyze each Plaintiff's claim as to each Defendant and for each arrest warrant. Layered over that complex analysis is the fact that this case involves events that happened over a decade ago.

### A.    Malicious Prosecution Claims Against Brower and Mims

#### 1.    Issues Not in Dispute

Under the factors enumerated in *Butler* to make out a 42 U.S.C. § 1983 malicious prosecution claim, the first, third, and fourth factors are not in serious dispute, and the Court makes quick work of the sixth.

#### *i.*    Institution of the Criminal Prosecutions

*First*, Plaintiffs were arrested based on warrants procured by Mims, some of which depended on material information from Brower.[55] *Butler*, 85 F.4th at 1112 (indicating the first element was satisfied where the defendant sought and obtained the arrest warrants). To find a Fourth Amendment violation, an officer need not have applied for the warrant himself if he intentionally or recklessly made misstatements or omissions that were necessary to support the probable-cause finding. *Laskar v. Hurd*, 972 F.3d 1278, 1296–97 (11th Cir. 2020); *Williams*, 965 F.3d at 1165. Although some of the warrants did not include any information from Brower and he attempts to minimize the importance of the information he did

---

[55]   ECF 85, ¶¶ 38–43, 58–70; ECF 86, ¶¶ 38–43, 58–70.

provide, those points of distinction are discussed below as part of the probable cause analysis.[56]

### ii.    Termination in Plaintiffs' Favor

*Third*, the proceedings ended in Plaintiffs' favor when the district attorney discontinued the prosecutions.[57] *Butler*, 85 F.4th at 1112 (citing *Thompson v. Clark*, 596 U.S. 36, 49 (2022)) (noting that the prosecutions against the plaintiff terminated in her favor when the charges against her were dismissed); *Laskar*, 972 F.3d at 1293 ("[A] plaintiff can satisfy the favorable-termination requirement by proving that the prosecution against him formally ended in a manner not inconsistent with his innocence on at least one charge that authorized his confinement.").

### iii.    Damage to Plaintiffs

*Fourth*, Plaintiffs suffered damage because they were arrested and detained.[58] The length of their detainer goes only to damages, not whether they can satisfy the elements of malicious prosecution. Plaintiffs would still be entitled to seek nominal damages even if they had no proof of *actual* damages. *Williams*, 965 F.3d at 1161 (citing *Slicker v. Jackson*, 215 F.3d 1225, 1231 (11th Cir. 2000)).

---

[56]    *See infra* Section III.A.3.iii.

[57]    ECF 81-2, ¶ 83; ECF 85, ¶ 75; ECF 86, ¶ 75.

[58]    ECF 85-1, ¶¶ 38–39; ECF 86, ¶¶ 38–39.

2.     **Warrantless Seizure**

The *sixth* element of a § 1983 claim for malicious prosecution requires a showing that the seizure of the plaintiff would not otherwise have been justified without legal process, that is, without a warrant. *Butler*, 85 F.4th at 1111–12. Brower does not argue that Plaintiffs' arrests would have been proper without the warrants, but Mims does.[59] A warrantless seizure may be permissible if the detention is only for a "brief" period. *Williams*, 965 F.3d at 1164. In such situations, information known to the arresting officer but not communicated to the magistrate who issued the warrant may be considered to justify the seizure. *Harris v. Hixon*, 102 F.4th 1120, 1134 (11th Cir. 2024); *Williams*, 965 F.3d at 1164.

The exact contours of what constitutes a "brief" period have not been fully defined but the case law makes clear that more than 48 hours is *not* brief. In fact, it is presumptively unconstitutional. *Williams*, 965 F.3d at 1164 (discussing *County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991), which held that a detention of more than 48 hours without a judicial determination of probable cause was presumptively unconstitutional). "Brief" instead seems to be limited to only a handful of hours. *Harris*, 102 F.4th at 1134–35 (concluding the plaintiff's detention had been brief because he was held "just a few hours"; discussing *Wood v. Kelser*, 323 F.3d 872 (11th Cir. 2003)), where the plaintiff was held for four or five hours).

---

[59]    ECF 79-2 (Mims SJM), at 31–33; *see generally* ECF 81 (Brower SJM).

Mims argues that Plaintiffs' detentions were brief, but that is belied by his own evidence.[60] According to Mims, each Plaintiff was held at least overnight on the July 6 warrants; Zachary, Alicia, and Rebecca were held for two days and Jerry was held for four.[61] Zachary and Jerry may have been held even longer because of the July 11 warrants.[62] A minimum of two and four days is presumptively not brief. *Harris*, 102 F.4th at 1134–35; *Williams*, 965 F.3d at 1164.

The parties disagree about the length of Danny's detention because additional warrants for his arrest were issued the day after his initial arrest on July 7, 2014, although it seems Danny was not charged with those new crimes until July 11.[63] According to Mims, Danny did not bond out of jail until ten days later.[64] Neither side has pointed to any case law that indicates whether the subsequent warrants or the timing of the later charges affects the brevity analysis. So, on this record, the Court cannot conclude that Danny's at-least-overnight-but-possibly-ten-day-detention was "brief." Accordingly, Plaintiffs' seizure was not otherwise justified without legal process and the purportedly "brief" seizures cannot be justified with information Mims did not present to the magistrate judge.

---

[60]   ECF 79-2, at 32–33.

[61]   *Id.*

[62]   *Id.*

[63]   *Id*; ECF 90-1, ¶ 151.

[64]   ECF 79-1, ¶¶ 102, 157.

### 3.  Probable Cause

That leaves the merged *second* and *fifth* factors concerning probable cause as far as the merits of Plaintiffs' malicious prosecution claim, and the *seventh* factor which relates to Defendants' qualified immunity defense. *Butler*, 85 F.4th at 1112. In short, to satisfy these necessary elements, Plaintiffs must show that their arrests lacked both probable cause *and* arguable probable cause. *Id.* at 1116.

At the time of Plaintiffs' arrests, it was clearly established that it violated the Fourth Amendment to intentionally make misstatements or omissions in an arrest warrant, or to do so with reckless disregard for the truth, where the misstatement or omission was necessary to the probable cause finding. Defendants do not dispute this.[65] "The requirement that a warrant not issue 'but upon probable cause, supported by Oath or affirmation,' would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause." *Franks v. Delaware*, 438 U.S. 154, 168 (1978) (applying principle to search warrants); *see also Williams*, 965 F.3d at 1168–69 (citing *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009)); *Jones v. Cannon*, 174 F.3d 1271, 1285 (11th Cir. 1999)) (indicating principle applies to arrest warrants); *Kelly*, 21 F.3d at 1549 (quoting *Strength*, 854 F.2d at 425) (noting that "this Circuit has recognized a federal right to be free from 'prosecutions procured by false and misleading information'")).

---

[65]  *See generally* ECFs 79-2 & 94; ECF 81-1, at 19–20.

Nor do Defendants deny that it was clearly established that an officer violates the constitution if he seeks a warrant using an affidavit that does not "show reasonably objective probable cause," even when the magistrate issues the warrant anyway. *Kelly*, 21 F.3d 1555; *cf. Williams*, 965 F.3d at 1162 (citing, *inter alia*, *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971)) (stating that "an officer ordinarily does not violate the Fourth Amendment when he executes a facially valid arrest warrant, regardless of whether the facts known to the officer support probable cause")). "While an officer needn't prove every element of the charged crime, [his] knowledge that an element isn't met—or is exceedingly unlikely to be met—will preclude a finding of probable cause." *Butler*, 85 F.4th at 1116 (citing *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003) and *Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998)).

*Arguable* probable cause examines what a reasonable officer in Defendants' position would have believed and is relevant to the application of qualified immunity (not the underlying elements of a malicious prosecution claim). What was reasonable, in turn, depends on the elements of the crime with which Plaintiffs were charged, to wit: commercial gambling. *Butler*, 85 F.4th at 1116 ("To assess probable cause, we look to the elements of the underlying crime—and in particular, in a malicious-prosecution case like this one, to the elements of the *charged* crime."). So, the operative question for qualified immunity here is, would

a reasonable officer in Defendants' shoes and with their knowledge have believed there was a substantial chance that Plaintiffs had engaged in commercial gambling? If so, there was arguable probable cause and Defendants would be entitled to immunity. *Id.*

### i.   The Relevance of Defendants' Personal Knowledge to Probable Cause

Mims argues that the relevant inquiry for purposes of qualified immunity is not whether a reasonable officer would have believed Plaintiffs had engaged in commercial gambling but whether such an officer would have believed there was arguable probable cause to arrest Plaintiffs for *any* crime.[66] That is not the law.

In *Williams v. Aguirre*, the Eleventh Circuit made clear that the "any-crime rule" for which Mims advocates does not apply to claims for malicious prosecution. 965 F.3d at 1162. Mims contends that the Court cannot apply the ruling from *Williams* here because the case was decided *after* Plaintiffs were arrested—as a result, Mims claims the law as set out by *Williams* wasn't clearly established in 2014.[67] If Mims were correct, to assess whether he was entitled to qualified immunity the Court would evaluate if there was arguable probable cause to arrest Plaintiffs for *anything*, not just commercial gambling. But he isn't correct.

---

[66]   ECF 79-2, at 23–27.

[67]   *Id.*

Mims's argument is fatally flawed because the law was clearly established long before 2014 that an officer cannot constitutionally seek an arrest warrant when he (1) should know that the application does not establish probable cause or (2) intentionally or recklessly makes false statements or omissions in the application that are necessary to show probable cause. *See, e.g., Franks*, 438 U.S. at 155; *Butler*, 85 F.4th at 1112; *Kelly*, 21 F.3d at 1549; *Haire*, 219 F. App'x at 846 (1978). Nothing in *Williams* altered that. Mims misapprehends exactly what law must be clearly established for purposes of the qualified immunity analysis.

Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[68] It is only the constitutional right the officer is alleged to have violated that must have been clearly established—here, whether it was a clear constitutional violation (1) to seek warrants based on applications that Defendants should have known did not show "reasonably objective probable cause," *Whiteley*, 401 U.S. at 568; *Kelly*, 21 F.3d 1555; or (2) to seek arrest warrants

---

[68] There is no dispute that Defendants were performing discretionary functions.

relying on intentional or reckless misstatements or omissions to establish probable cause, *Butler*, 85 F.4th at 1112.[69] That's all.

In contrast, *Williams* set out to reconcile whether the "any-crime" rule applied to claims for malicious prosecution because the Eleventh Circuit had not been consistent about what information a court should consider when assessing the existence of probable cause for a seizure pursuant to a warrant. 965 F.3d at 1163. *Williams* clarified the universe of information a court should consider when an officer later asserts that there was arguable probable cause (and thus, qualified immunity) for an arrest: only information that would support probable cause for the charge on which the plaintiff had been arrested—not some other crime. That has nothing to do with whether the relevant constitutional right was clearly established.

---

69   The Court rejects Brower's invitation to read "recklessly" out of the clearly established conduct that can support a malicious prosecution claim. He asserts that, because the Eleventh Circuit hasn't decided exactly where the line between negligent and reckless conduct falls, the law can't be clearly established so recklessness is never sufficient. ECF 81-1, at 32–33. For purposes of Plaintiffs' claims, what needed to have been—and, in fact, was—clearly established at the time was that intentionally or recklessly false statements or omissions cannot be used to support probable cause in an arrest warrant. This case isn't about the line between negligence and recklessness. It is about the alleged intentional or knowingly reckless conduct of Defendants. And an officer's *subjective* knowledge of his own recklessness is clearly sufficient to overcome qualified immunity. *Butler*, 85 F.4th at 1112 n.1. So, if Defendants *knew* they were being reckless in including or omitting information from the arrest warrants, such evidence will support Plaintiffs' § 1983 claims.

23

Decades before Plaintiffs' arrests, the United States Supreme Court held that the "Fourth Amendment probable-cause requirements before a warrant for either arrest or search can issue require that the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." *Whiteley*, 401 U.S. at 564 (citations omitted) (footnote omitted). The *Williams* court emphasized that while its

> precedents on malicious prosecution were unsettled when the officers accused Williams, [ ] those doctrinal tensions concerned only the relationship between Fourth Amendment violations and malicious prosecution, the vehicle that we have held controls liability for these violations. ***We have never wavered about the prohibition of misstatements in warrant applications***. . . . ***Our prohibition of intentional, material misstatements in warrant applications has long been a cornerstone of this Court's jurisprudence on the validity of warrant-based seizures. In the light of this uncontroverted and well-established rule, we readily conclude that "every reasonable official would interpret [our precedents] to establish" that intentional, material misstatements in warrant applications violate the Constitution.***

*Id.* at 1169 (emphasis added) (citations omitted). *Williams* thus made abundantly clear that the constitutional violations asserted here—arrests based on warrants lacking probable cause or containing materially false statements or omissions— have long been "clearly established" law. *Williams* did not alter that in any fashion.

The *Williams* Court therefore applied the principle it announced in that case itself — the any-crime rule does not apply to malicious prosecution claims—*because*

the principle did not relate to whether the alleged constitutional violation had been clearly established. 965 F.3d at 1165. Its holding goes to what information is relevant to establish the malicious prosecution claim and qualified immunity defense, not what constitutes an unconstitutional seizure under the Fourth Amendment. The plaintiff in *Williams* could therefore demonstrate that his arrest warrant was constitutionally infirm either by showing that the officer who applied for it should have known that it did not establish probable cause for the crime charged or that the officer intentionally or recklessly made misstatements or omissions necessary to support the warrant. *Id.* If *Williams* had concerned whether the law relevant to the alleged unconstitutional seizure was clearly established, the Court of Appeals could not have applied the rule it announced in the case before it. *See Gilmore v. Ga. Dep't of Corr.*, 111 F.4th 1118 (11th Cir. 2024) (finding a violation of the plaintiff's constitutional right not to be subjected to a suspicionless strip search but concluding that the officers were entitled to qualified immunity because that right had not been clearly established under Eleventh Circuit precedent).

Moreover, Mims's argument cannot be squared with the Eleventh Circuit's decision in *Butler v. Smith*. In *Butler*, the court applied *Williams's* holding (that the any-crime rule does not apply to malicious prosecution claims) when analyzing the plaintiff's claims related to her September 2017 arrest pursuant to two warrants

for child cruelty. 85 F.4th 1102. If *Williams* were inapplicable to claims arising from conduct that took place before Williams was decided in 2020—as Mims argues—the Court of Appeals itself violated that principle in *Butler*. This Court will not presume that the appellate court so quickly disregarded its own precedent. Rather, *Butler* simply follows the directive from *Williams* about the relevant universe of information a court should consider when evaluating malicious prosecution claims and qualified immunity defenses.

In evaluating the substance of Plaintiffs' claims, then, the Court looks only to (1) the information that was before the magistrate judge, minus (2) any material misstatements, plus (3) any material information that was omitted from the warrants to determine whether there was probable cause for the commercial gambling charges. *Butler*, 85 F.4th at 1113–14 (citing *Paez*, 915 F.3d at 1287). An arrest warrant lacking probable cause cannot be rehabilitated using information known to the swearing officer but not disclosed to the magistrate. *Whiteley*, 401 U.S. at 565 n.8; *Williams*, 965 F.3d at 1162–63; *see also Butler*, 85 F.4th at 1113 (quoting *Luke v. Gulley*, 50 F.4th 90, 96 (11th Cir. 2022)) ("[P]robable cause in a malicious-prosecution claim challenging an arrest pursuant to a warrant can't be shown by reference to information in an officer's investigative file or mind absent a 'record . . . that he submitted the file to or explained his thought processes to the

magistrate judge.'"). Nor can arrest warrants retroactively be supported by evidence of *other* crimes. *Williams*, 965 F.3d at 1162.

While Brower and Mims attempt to rely on facts purportedly known only to them when Mims applied for the warrants to show the existence of *probable cause*, neither has pointed to any record evidence that the magistrate judge who authorized the warrants was presented with anything *other than* what was written in the warrant applications themselves. "[I]f there isn't undisputed evidence that an inculpatory fact *was* before the magistrate, then [the Court] must assume that it *wasn't*." *Butler*, 85 F.4th at 1113 n.2. But for purposes of qualified immunity and whether there was *arguable* probable cause, the Court *does* look to information known to Brower and Mims that a reasonable officer could have believed would support probable cause for the commercial gambling charges. *Id.* at 1116. Qualified immunity does not, however, shield an officer who unreasonably concludes that probable cause exists. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007).

### ii.   Defendants' Interpretation of Georgia Law

An officer's objectively reasonable mistake as to the law does not support a claim for a violation of the Fourth Amendment. *Heien v. North Carolina*, 574 U.S. 54 (2014). Plaintiffs argue that no reasonable officer would have interpreted the law as Brower and Mims did at the time.[70] Unfortunately for Plaintiffs, the Court

---

[70]   *See, e.g.*, ECF 77, at 21–22; ECF 90, at 2–4.

cannot say that Brower's and Mims's tortuous interpretation of Georgia's comprehensive COAM and gambling laws was objectively unreasonable.

While the Georgia Court of Appeals' straightforward reading of the applicable statutes in *Bartlett* might now seem the only obvious interpretation to a trained lawyer, the record demonstrates that many law enforcement and government officers—including trained lawyers—held the same understanding as Brower and Mims prior to the issuance of the appellate court's opinion in 2019.[71] *See also Georgia v. Singh*, 291 Ga. 525, 528–29 (2012) (upholding denial of a motion to dismiss an action under the Georgia RICO statute predicated on the illegal gambling activity of paying out cash winnings to COAM players). While Brower's and Mims's subjective understanding does not control, *Heien*, 574 U.S. at 66, the *Bartlett* case itself shows not only that a reasonable officer *could* have read the law as Brower and Mims did but that those involved in *Bartlett did* read the law that way. 351 Ga. App. at 476. The Court therefore cannot conclude that Defendants' mistake of law as to the interpretation of the COAM and commercial gambling statutes was objectively unreasonable. As a result, it is not a Fourth Amendment violation and does not provide a basis for Plaintiffs' malicious prosecution claims.

---

[71] *See, e.g.*, ECF 79-1, ¶¶ 108–110; ECF 81-2, ¶¶ 16–21.

Notwithstanding Brower's and Mims's theory about cash payouts converting COAMs into illegal gambling machines and stores into gambling places, it was objectively unreasonable in 2013 and 2014 to treat the crime of commercial gambling as a strict liability offense. The statutes plainly required a person to **intentionally** operate a gambling place or **intentionally** participate in the earnings of such a place. O.C.G.A. § 16-12-22(a)(1). Defendants were obviously aware of that requirement and the arrest warrants all took care to allege intentional participation.

The Court now turns to whether there was arguable probable cause to believe any Plaintiff was engaged in the criminal activity of commercial gambling.

### iii. The Warrants Against Each Plaintiff

#### a. The July 6 Warrants Against Jerry, Danny, and Zachary

##### 1. Brower's Arguments

Plaintiffs credit Brower with developing the cash-payouts-convert-COAMs-into-illegal-gambling-devices theory used to support the commercial gambling charges against them.[72] Even assuming that's true, it alone is insufficient to support a malicious prosecution claim. Regardless of the extent of Brower's involvement in the investigation, Plaintiffs concede that none of the information

---

[72]   ECF 91-1, ¶¶ 60, 62.

in the July 6 arrest warrants for Jerry, Danny, or Zachary came from Brower.[73] Plaintiffs have not explained how having developed a theory used by another officer as a basis to seek arrest warrants constitutes instituting a criminal prosecution. *Butler*, 85 F.4th at 1111. Moreover, "[a] § 1983 claim cannot be based upon vicarious liability." *Brown v. Smith*, 813 F.2d 1187, 1187 (11th Cir. 1987) (citing *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1504 (11th Cir. 1985)); *see also Kelly*, 21 F.3d at 1551 ("There is no authority for imputing to those two detectives the knowledge and alleged culpability of another detective; the law did not then, and does not now, clearly establish such vicarious co-employee liability."). Plaintiffs have not met the first factor necessary for their malicious prosecution claims.

Nor have Plaintiffs pointed to any clearly established law from the Supreme Court or Eleventh Circuit indicating that an officer who is the impetus for a theory of liability is liable for malicious prosecution when that officer did not intentionally or recklessly make misstatements or omissions necessary to support probable cause. Brower would therefore be entitled to qualified immunity in any event. In short, "[w]ithout alleging that [the defendant] intentionally or recklessly made false statements to support the legal process justifying [the plaintiff's] seizure, [the plaintiff's] claims . . . fail." *Laskar*, 972 F.3d at 1297. Accordingly, Jerry,

---

[73]   ECF 91-1, ¶¶ 60, 62.

Danny, and Zachary cannot pursue malicious prosecution claims related to the July 6 warrants against Brower.[74] Mims, however, is a different story.

### 2.    Mims' Arguments

Viewing disputed factual issues in the light most favorable to Plaintiffs, as the Court must, there are disputed facts material to the existence of probable cause and arguable probable cause. The application of qualified immunity is therefore inappropriate.

### (i)    Jerry and Danny

The July 6 arrest warrants for Jerry and Danny were based on events that took place at the BP Quick Change in Tifton.[75] The confidential informant owned the BP.[76] The warrants allege that Jerry and Danny intentionally participated in the earnings of a "gambling place" because each was a "co-owner of M&M" with the other and collected their "share of the profits for the Video Gambling Machines" located at the BP.[77]

Neither warrant states that Jerry or Danny told the confidential informant or anyone else at the BP that they could pay out cash on the Machines, so the basis

---

[74]    To the extent the malicious prosecution claims against Brower are being dismissed, Plaintiffs' dependent § 1988 claims are also dismissed.

[75]    ECF 77-3, at 9; ECF 77-4, at 9; ECF 77-5, at 8; ECF 85-1, ¶ 46; ECF 86, ¶ 46.

[76]    ECF 85-1, ¶ 49; ECF 86, ¶ 49.

[77]    ECF 77-3, at 9; ECF 77-4, at 9.

for Mims's assertions that the BP was a gambling place, the Machines were video gambling machines, and Jerry and Danny intentionally participated in gambling earnings was not before the magistrate judge. In support of his contention that there was *arguable* probable cause for these arrest warrants, Mims asserts he also had information that (1) Jerry had provided the informant with false receipts reflecting that the Machines had made less money than they did; and (2) the informant said the owners of M&M were telling store owners to pay cash.[78] That information was not, however, before the magistrate judge either.

Mims's conclusion that probable cause existed was based on his interpretation of a recorded conversation between Jerry and the informant.[79] Mims avers that he interpreted that conversation as Jerry encouraging the informant to pay out cash to winners on the Machines.[80] Plaintiffs dispute that anything on the recording could be interpreted in that manner and Jerry categorically denies having made any such statements.[81]

The recorded conversation, knowledge of the false receipts, and the informant's prior statement are the only information Mims had that could

---

[78]   ECF 79-1, ¶¶ 14, 34–35.

[79]   ECF 79-1, ¶¶ 14–19.

[80]   *Id.* ¶ 19.

[81]   ECF 90-1, ¶¶ 16–19.

arguably have supported probable cause for the warrants—the only justifications for the statements in the warrants that Jerry and Danny intentionally participated in anything illegal. Otherwise, the BP wasn't a gambling place and the Machines weren't illegal gambling devices—the warrant applications would only describe the perfectly legal activity of Jerry and Danny collecting profits from COAMs (not Video Gambling Machines) at a legitimate store (not a gambling place). "Of course, an affidavit does not support probable cause if it lacks any facts that suggest a crime occurred." *Williams*, 965 F.3d at 1167 (citing *Garmon v. Lumpkin Cnty.*, 878 F.2d 1406, 1408–09 (11th Cir. 1989)).

Having listened to the audio recording of the conversation, as well as having reviewed the parties' competing certified transcripts of the recording, the Court has no trouble concluding that a jury could find that Jerry did not say anything that could be construed as encouraging the informant to pay cash and that Mims was not being truthful about his interpretation of that conversation. If so, Mims only had the false receipts and unverified statement from the informant, which weren't before the magistrate.[82] That is not enough for probable cause (or even

---

[82] Although the informant purportedly told the Task Force that M&M's owners were telling store owners to pay out cash, ECF 79-1, ¶ 14, there was no indicia of the informant's reliability without the recorded conversation. *See Georgia v. Cochran*, 275 Ga. App. 185, 187 (2005) (indicating that, to support probable cause using information from an informant, the warrant must contain some indicia from which the magistrate can assess the informant's reliability); *see*

arguable probable cause) that Jerry and Danny engaged in commercial gambling and Mims should have known it—regardless of the magistrate's ultimate decision to issue the warrants. Moreover, a jury could conclude that the affirmative statements in the warrants that Jerry and Danny intentionally participated in the earnings of a gambling place were purposefully or recklessly false. Such a determination would preclude the application of qualified immunity. An officer seeking an arrest warrant must have a reasonable belief in the veracity of the information he provides to the magistrate who evaluates the warrant applications. *Butler*, 85 F.4th at 1114.

Or a jury could believe that, based on his law enforcement experience, Mims drew reasonable conclusions from the discussion between the informant and Jerry. Since the informant's prior statement implicated Danny as well, the recorded conversation would have lent credence to the assertion that both Jerry and Danny were involved. If so, there would have been arguable probable cause for the warrants and Mims would be entitled to qualified immunity. The answer depends on Mims's credibility, as well as Jerry's and Danny's. On a "highly disputed factual record," "factual, credibility-sensitive task[s are] best left to the jury." *Skop*, 485 F.3d at 1141.

_____

*also Illinois v. Gates*, 462 U.S. 213 (1983) (an informant's veracity, reliability, and basis of knowledge are relevant to assessing probable cause).

### (ii)   Zachary

The July 6 warrant for Zachary states that he "intentionally participate[d] in the earnings of a gambling place, to-wit: Zachary White is an employee of M&M Amusement and Zachary did collect the profits for the company from the [BP]."[83] That Mims might reasonably have thought Zachary was an employee of M&M (as alleged in the warrant) and that he was paid by M&M for his work[84] alone do not  show probable cause or even arguable probable cause of Zachary's knowing participation in the profits of a gambling place. They certainly are not a sufficient basis to conclude Mims is entitled to qualified immunity.

Mims asserts that it was not "clearly established" that he had to prove intent for there to be arguable probable cause.[85] First, and as this Court has already explained, that is not what needed to have been clearly established.[86] Second, while concrete evidence of a person's subjective intent isn't necessary to establish arguable probable cause and arguable probable cause doesn't require proving every element of a crime, *Gates v. Khokhar*, 884 F.3d 1290, 1300 (11th Cir. 2018), it was clear even in 2014 that there must be *some* evidence from which an objectively

---

[83]   ECF 77-5, at 8.

[84]   ECF 79-1, ¶ 61.

[85]   ECF 94, at 5–6.

[86]   *See supra* Section III.A.3.i.

reasonable officer could think the person being seized had the necessary mens rea, *id.* at 1300–01.

The commercial gambling offense with which Plaintiffs were charged is only a crime in the first place if the person has the necessary intent. O.C.G.A. § 16-12-22(a)(1). Mims has not pointed to any evidence that Zachary (1) told anyone to pay out cash on the Machines, (2) knew that Jerry or Danny had done so, or (3) had done anything himself that suggested he might know the Machine proceeds were (purportedly) from a gambling place. The only evidence Mims had was that Zachary was (possibly) paid by M&M and picked up proceeds from the Machines (which was an otherwise legal activity). There is nothing from which a reasonable officer might conclude Zachary knew the proceeds were (thought to be) from illegal gambling. Being paid by a legitimate business that might also be engaged in an illegal side-hustle doesn't create arguable probable cause to arrest every person paid by that company regardless of the person's knowledge about the source of the proceeds. And a jury could reasonably conclude that Mims intentionally or recklessly swore in the warrant application that Zachary intentionally participated in the earnings of a gambling place while knowing or recklessly disregarding that Zachary did not have the requisite intent. *Butler*, 85 F.4th at 1116.

### b.    The Alicia White Arrest Warrant

Alicia owned a business called the Lucky Shamrock, in which several of the Machines were located. The parties do not, however, agree about **when** Alicia became owner.[87] Brower and Mims contend that it was in January 2014.[88] Plaintiffs assert that Alicia did not take over ownership until several weeks later.[89] Nothing in the record conclusively establishes the date she took over control. What the evidence does show is the lack of clarity about the timing of her ownership.

Given Brower and Mims's interpretation of the relevant statutes, the exact timing of Alicia's ownership was crucial to existence of arguable probable cause. This becomes clear when reviewing the allegations in the warrant application:

> Alicia Lynn Lamb did intentionally participate in the earnings of a gambling place, to-wit: ***On 01/15/2014 Alicia Lamb applied for a license for the Lucky Shamrock and has operated the business since that date. Lamb also opened a checking account for the business.*** The Lucky Shamrock contains numerous video gambling machines and makes cash payouts.[90]

The emphasized sentences are based on information Brower provided to Mims to obtain the warrant.[91] Only one of the purported cash payouts at the Lucky

---

[87]   ECF 81-2, ¶ 44; ECF 91-1, ¶ 42.

[88]   ECF 81-2, ¶¶ 43–45; ECF 85-1, ¶ 35.

[89]   ECF 85-1, ¶ 35; ECF 91-1, ¶¶ 42, 45.

[90]   ECF 77-7.

[91]   ECF 81-2, ¶ 61.

Shamrock took place *after* January 15, 2014—on January 16, a Task Force agent was paid cash for his winnings on one of the Machines.[92]

Under Brower's and Mims's interpretation of Georgia law, the devices at the Lucky Shamrock were only video gambling machines ***because*** cash payouts were being made, so the timing of the payouts mattered. If they happened after Alicia took over, there might be a basis to infer that she knew about them, which could support the allegation of intent and arguable probable cause. But if the cash payouts all happened before Alicia took over ownership, there is no evidence from which an objectively reasonable officer might infer she had the necessary intent.[93] The crucial information about Alicia's ownership came from Brower.

Brower had information showing that, on January 15, 2014, Alicia applied for a license to become a dealer in precious metals using the name Lucky Shamrock.[94]  Brower conveyed that information to Mims for Mims to swear out Alicia's arrest warrant.[95] Brower now characterizes the precious metals license as "indicat[ing] that [Alicia] was the owner of the Lucky Shamrock and that she had

---

[92]  ECF 79-1, ¶ 45.

[93]  Brower's and Mims's knowledge that the prior owner had paid cash to COAM winners and that the (unspecified) owners of the machines told her it was legal to pay cash, ECF 79-2, at 5–6, does not provide any support for *Alicia's* alleged knowledge.

[94]  ECF 81-2, ¶¶ 44; ECF 81-3, at 25.

[95]  ECF 81-2, ¶ 61.

obtained a business license for that location."[96] The document actually says "Full name of business: Lucky Shamrock" and "Under what name will the business be operated: Lucky Shamrock."[97] The Court will not construe factual inferences in Defendants' favor when considering *their* summary judgment motions. *Anderson*, 477 U.S. at 255.[98] The license application does not say that Alicia owned the Lucky Shamrock as of January 15.

Brower was also aware of competing evidence that Alicia had not yet taken over the business as of January 15. On July 1, 2014, he forwarded an email to Mims indicating that there were licenses for COAMs to be at the Lucky Shamrock issued to two different people (Alicia being one of them). Alicia did not receive her license until February 25, 2024, and the other license did not end until March 20, 2024.[99] Brower acknowledged the importance of this discrepancy in the email to Mims:

---

[96]   ECF 81-2, ¶ 44.

[97]   ECF 81-3, at 25.

[98]   Brower also asserts that he had information showing Alicia had opened a small business account on the same date, ECF 81-2, ¶ 43; ECF 81-3, at 22, but those documents are not in the record. Given the parties' dispute about the meaning of a document *in* the record, the Court does not consider Brower's hearsay report about the bank account documents not in the record. Nor is it clear that Brower shared this information with Mims in any event.

[99]   ECF 81-3, at 30.

"The shamrock apparently has been licensed since 12/9/13. This will come up at some point even though your UC was done before then."[100]

If Alicia did not own or control the Lucky Shamrock as of January 15, there was no evidence (even under Brower and Mims's interpretation of the COAM and gambling statutes) to support the assertion that Alicia **_intentionally_** participated in the earnings of a gambling place. There is sufficient evidence for a jury to conclude that Brower and Mims intentionally, or knowing that they were acting recklessly, misstated in the warrant that Alicia owned the business as of that date. That is, a jury could conclude that Brower and Mims "subjectively knew the facts that [were] omitted from [the] affidavits and that [the] nondisclosure of those facts was, at the very least, reckless." _Butler_, 85 F.4th at 1112 n.1.[101] Alicia's ownership was a necessary predicate to arguable probable cause. Accordingly, neither Brower nor Mims is entitled to qualified immunity at this stage as to the arrest warrant for Alicia White.

---

[100] _Id._

[101] This fact distinguishes the instant case from _Hilmo v. Jackson_, an unreported Eleventh Circuit decision in which the court upheld summary judgment in favor of the officer where the law was not clearly established that her conduct (failing to follow procedures to confirm that the plaintiff was still on probation when the officer arrested him to revoke his probation) was reckless rather than negligent. No. 22-13015, 2023 WL 4145495, at *3 (11th Cir. 2023) (per curiam). Knowingly reckless misstatements or omissions in an arrest warrant violated clearly established law, even in 2014. _Butler_, 85 F.4th at 1112 n.1 (discussing _Kelly_, 21 F.3d at 1544).

### c.    The Rebecca Macri Arrest Warrant

### 1.    Brower's Arguments

As to Rebecca, Brower collected records during the investigation showing that she deposited five checks from M&M for $460 each into her bank account.[102] Brower supplied this information to Mims so that Mims could swear out the warrant application.[103] It states:

> Rebecca Jean Macri did . . . commit the offense of, TO WIT 16-12-22 COMMERCIAL GAMBLING . . . . Rebecca Macri intentionally participate[d] in the earnings of a gambling place, to-wit: On April 1st, 8th, 16th, 23rd and 28th of 2014, Rebecca Macri deposited a check from Ameris Bank . . . in the amount of $460.00 each (totaling $2,300). Account [xxxxxx]418 was identified as an operating account in the name "M&M Amusement."[104]

Although the entire factual substance of the arrest warrant came from Brower, the information did not contain any material misstatement or omission. Rebecca did in fact deposit five checks from M&M.[105] So, Plaintiffs cannot establish that Brower intentionally or recklessly made any misstatements or omissions necessary to finding probable cause, which is necessary to the malicious prosecution claim.

---

[102]  ECF 81-2, ¶ 55.

[103]  ECF 81-2, ¶ 63.

[104]  ECF 77-6. Brower incorrectly informed Mims that the date of the last check was April 28, 2014; the deposit was made on April 29. ECF 81-2, ¶ 63. That error is immaterial for purposes of the parties' motions.

[105]  ECF 79-1, ¶ 60.

*Laskar*, 972 F.3d at 1296–97; *Williams*, 965 F.3d at 1165. Nor have Plaintiffs pointed to any law clearly establishing that an officer who supplies *accurate* information to another officer would be liable for that other officer's Fourth Amendment violation, *Kelly*, 21 F.3d at 1551, so Brower would be entitled to qualified immunity in any event.

## 2.   Mims's Arguments

As with the July 6 warrant for Zachary, Mims lacked any evidence suggesting Rebecca had any knowledge that the money from M&M was (allegedly) gambling earnings. Mims claims he had information that Rebecca was paid by M&M and "thus profits from the cash payments" and that the Task Force had recovered from her trash a check from M&M made out to her.[106]

The offense of commercial gambling required that a person intentionally participate in such proceeds. No reasonably objective officer could have thought otherwise at the time. Without any evidence suggesting that Rebecca might have known the money was (allegedly) derived from gambling earnings, the conduct described in the warrant was entirely legal and arguable probable cause did not exist. A jury could reasonably conclude that Mims intentionally or recklessly swore that Rebecca intentionally participated in the earnings of a gambling place

---

[106]   ECF 79-1, ¶¶ 37, 116.

while knowing or recklessly disregarding that a finding of probable cause was "exceedingly unlikely to be met." *Butler*, 85 F.4th at 1116.

### d.   The July 11 Warrants

#### 1.   Brower's Arguments

The parties do not dispute that Brower did not supply any of the information in the July 11 warrants.[107] For the reasons explained above, then, Jerry, Danny, and Zachary cannot pursue their malicious prosecution claims based on those warrants against Brower. Mims procured the warrants and supplied the information in them.[108]

#### 2.   Mims's Arguments

##### (i)   Jerry

The eight arrest warrants issued for Jerry on July 11, 2014 (collectively) allege that he engaged in commercial gambling on various dates, at various stores by intentionally participating in the earnings of a "gambling place." Each of the warrants indicates that the cashier at the store paid out cash for winnings on a "gambling machine" to a (presumably undercover) agent.[109] Six of the warrants state that the store owners "had been advised by Jerry Macri that it was ok to pay out cash and Jerry Macri, Danny White, and Zach White were picking up the

---

[107]   ECF 81-2, ¶¶ 58–60; ECF 91-1, ¶ 60.

[108]   ECF 79-1, ¶ 62; ECF 81-2, ¶¶ 58–60; ECF 91-1, ¶ 60.

[109]   ECF 77-3, at 1–8.

profits from said [gambling] machines on a regular bases [sic]."[110] The other two warrants make the same allegation but indicate that the store owners were advised by both Jerry and Danny.[111]

Plaintiffs do not dispute that the warrant applications accurately reflected information the Task Force had uncovered.[112] What they dispute is the truthfulness of that information. Plaintiffs contend there was evidence—discovered later—that at least one set of owners blamed Jerry to exculpate themselves.[113] But Plaintiffs do not explain how evidence uncovered *after* the warrants had issued has any bearing on the existence of arguable probable cause to issue the warrants in the first place. Given Mims's (not objectively unreasonable) understanding of the law, the allegation that Jerry said it was ok to pay out cash coupled with the cash payments made to the agent are sufficient to establish arguable probable cause. Because Plaintiffs cannot show that the July 11 warrants as to Jerry were constitutionally deficient, Mims is entitled to summary judgment on the malicious prosecution claim to the extent it is based on those warrants.

---

[110]  ECF 77-3, at 1–6.

[111]  *Id.* at 7–8.

[112]  ECF 79-1, ¶¶ 93–94, 144–48; ECF 90-1, ¶ 146.

[113]  ECF 90, at 10–11.

**(ii)   Danny**

Like the warrants for Jerry, the July 11 warrants for Danny allege that he engaged in commercial gambling by intentionally participating in the earnings of a "gambling place." Each warrant indicates that a cashier had paid out cash on a gambling machine.[114] Six warrants reflect that the store owners "had been advised by Jerry Macri that it was ok to pay out cash."[115] Only two warrants indicate that Danny, as well as Jerry, had informed the store owners that it was ok to pay cash.[116] Again, Plaintiffs do not dispute that the warrant applications accurately reflected information known to the Task Force.[117]

The allegations that *Danny* said it was ok to pay out cash coupled with the cash payments made to the agent are sufficient to support probable cause for the two warrants that contain such an allegation.[118] The remaining warrants allege only that Jerry made the statement to the owners.[119] But—in contrast to the situation with the July 6 warrants—there was information before the magistrate judge when authorizing the July 11 warrants that Danny had told at least some

---

[114]  ECF 77-3, at 1–8.

[115]  ECF 77-3, at 1–6.

[116]  ECF 77-4, at 7 (Warrant No. CR 57577); *id.* at 8 (Warrant No. CR 57576).

[117]  ECF 79-1, ¶¶ 93–94, 144–48; ECF 90-1, ¶ 146.

[118]  ECF 77-4, at 7 (Warrant No. CR 57577); *id.* at 8 (Warrant No. CR 57576).

[119]  ECF 77-4, at 1–6 (Warrant Nos. CR 57575, 57579, 57582, 57581, 57580, 57578).

store owners they could pay out cash.[120] As a result, there was sufficient evidence to support arguable probable cause for all of the July 11 warrants as to Danny. *Butler*, 85 F.4th at 1113–14, 1114 n.3 (rejecting the plaintiffs' contention that the court should look at separate warrant applications in isolation when the applications were before the magistrate at the same time and considered them together).

### (iii)   Zachary

As to Zachary, the July 11 warrants contain allegations similar to those in the warrants for Jerry and Danny. They are based on events at seven different stores and that Jerry advised the store owners about cash payments.[121] One of them also alleges that Danny made such statements.[122] But nothing in them suggests a basis for the allegation that Zachary ***intentionally*** participated in the earnings of a gambling place. The warrants say that Zachary picked up the profits from the "gambling machines" on a regular basis but point to no evidence from which a reasonable officer might conclude Zachary had the necessary mens rea.[123] Because Zachary's actions would otherwise have been legal—even under Mims's

---

[120]   ECF 77-4, at 7–8.

[121]   ECF 77-5, at 1–7.

[122]   ECF 77-5, at 1.

[123]   ECF 77-5, at 1–6.

interpretation of the COAM and gambling statutes—allegations about what Jerry and Danny told store owners does not provide evidence that Zachary knew the proceeds were purportedly from illegal gambling. *Gates*, 884 F.3d at 1300–01. Moreover, a jury could reasonably decide that Mims intentionally or recklessly alleged Zachary's intent in the July 11 warrants. If so, arguable probable cause is lacking and Mims would not be entitled to qualified immunity.

### B.   Malicious Prosecution Claim against Scarbrough

Plaintiffs assert that there are issues of material fact related to Scarbrough's involvement such that summary judgment is inappropriate.[124] But they have failed to point to any evidence that Scarbrough instituted or continued the criminal prosecutions against them. Plaintiffs argue that the "entire prosecution" began because of Scarbrough,[125] and the Court construes the evidence on this point in Plaintiffs' favor (as it must). But even if that's why the investigation started, there is no evidence that Scarbrough applied for the arrest warrants himself or provided any information to Mims that was used in the warrant applications.[126] *Laskar*, 972 F.3d at 1296–97; *Williams*, 965 F.3d at 1165. Without such evidence, Plaintiffs cannot make out the first element of malicious prosecution: that the criminal

---

[124]  *See, e.g.*, ECF 77, at 12 n.1.

[125]  ECF 90, at 16–18.

[126]  *Id.*

*prosecutions* were instituted or continued by Scarbrough. *Butler*, 85 F.4th at 1111–12. Plaintiffs have not pointed to any law suggesting otherwise.

Nor have Plaintiffs pointed to any law that clearly establishes that an officer's allegedly wrongful motive in initiating an investigation violates the Constitution when the officer isn't responsible for any of the information from the arrest warrants.[127] Plaintiffs contend that Scarbrough "knew of the wrongful nature of the arrests and prosecution . . . yet did nothing about it."[128] But they have cited no authority for their suggestion that Scarbrough's inaction violated their clearly established constitutional rights. Accordingly, Scarbrough would be entitled to qualified immunity even if a jury agreed entirely with Plaintiffs' view of the facts. *Butler*, 85 F.4th at 1111–12; *Williams*, 965 F.3d at 1168.

## C.      Conversion Claims

Mims and Scarbrough seek judgment in their favor on Plaintiffs' conversion claim brought against them in their individual capacities. These Defendants argue that Plaintiffs cannot prove the elements of the claim nor overcome official immunity.[129] Plaintiffs counter that there is sufficient evidence to establish both.

---

[127]  *Id.*

[128]  *Id.* at 17.

[129]  ECF 79-2, at 34–35.

Depriving a person of personal property is a tort under Georgia law. O.C.G.A. § 51-10-1. To prove such a claim, a plaintiff must show (1) ownership of the property; (2) actual possession of the property by the defendant; (3) a demand by the plaintiff for return of the property; (4) the defendant's refusal to return the property; and (5) the value of the property. *Carter v. Butts Cnty.*, 821 F.3d 1310, 1324 (11th Cir. 2016) (citations omitted). The only property Plaintiffs have identified in support of the conversion claim is Rebecca's testimony that unspecified firearms, computers, laptops, iPads, gold bracelets, necklaces and rings were seized from her in connection with the investigation and not returned.[130] Plaintiffs assert that it is Defendants' burden to "establish that there is no set of facts that Plaintiffs could introduce to support their claim for conversion."[131] That is wrong.

Ownership is an essential element of Plaintiffs' conversion claim and thus something on which they bear the burden of proof at trial. In opposing summary judgment, then, it is *their* duty to make a sufficient showing of ownership. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (stating that "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to

---

[130]  ECF 90-1, ¶ 160.

[131]  ECF 90, at 19.

which she has the burden of proof"). Plaintiffs have pointed to no evidence that any property of Jerry, Danny, Zachary, or Alicia was confiscated and not returned to them. And Rebecca's property has not been identified in any manner that would allow it to be returned or valued with any degree of certainty. So, Mims and Scarbrough are entitled to judgment in their favor on Plaintiffs' conversion claims.

Moreover, Mims and Scarbrough would be entitled to official immunity as to Rebecca's claim. Such immunity "protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority." *Murphy v. Bajjani,* 282 Ga. 197, 198 (2007). Only where such agents act with "actual malice or actual intent to cause injury" is official immunity inapplicable. *Daniels v. Gordon,* 232 Ga. App. 811, 813 (1998) (citing *Teston v. Collins,* 217 Ga. App. 829, 830 (1995)). Plaintiffs do not dispute that Mims and Scarbrough were performing discretionary functions,[132] so the only issue is whether there is evidence that these Defendants acted with malice against Rebecca. A "deliberate intention to do wrong" is "the intent to cause the harm suffered by the plaintiffs." *Murphy,* 282 Ga. at 203. It requires "more than harboring bad feelings or ill will about another; rather, ill will must also be combined with the intent to do something wrongful or illegal." *Wyno v. Lowndes Cnty.,* 305 Ga. 523, 531 (2019)

---

[132] *Id.*

(cleaned up). Here, Plaintiffs have pointed to no evidence that either Mims or Scarbrough acted with an intent to harm Rebecca herself. Rather, Plaintiffs rely on evidence that might support the inference that Mims and Scarbrough acted with an intention to injure Jerry, and possibly Danny.[133] But Plaintiffs have not adduced evidence suggesting a deliberate intent to harm *Rebecca*. Without such evidence, Mims and Scarbrough are entitled to official immunity.[134]

## IV.   Plaintiffs' Summary Judgment Motion

As should be clear from the discussion above,[135] there are disputes of material fact that preclude the entry of judgment in favor of Brower and Mims on certain of Plaintiffs' malicious prosecution claims. Those same disputes prohibit entry of judgment in Plaintiffs' favor on those claims.

## V.   Motion to Seal

Brower moves to file a document supporting his summary judgment motion under seal because it contains information about the confidential informant and was marked confidential by the GBI.[136] Plaintiffs did not oppose the motion. Despite the age of the document (a report from August 2013), it does contain

---

[133]   *Id.* at 18–19.

[134]   Without a claim for conversion, Plaintiffs' claim for punitive damages (Count IV) also fails.

[135]   *See supra* Section III.A.

[136]   ECF 83.

information that could be used to identify the informant. As a result, the Court

concludes that it is appropriate to maintain the document under seal.

## VI.   Conclusion

Mims and Scarbrough's motion for summary judgment [ECF 79] is

**GRANTED in part and DENIED in part**. As to all claims against Scarbrough, the

motion is **GRANTED** and the claims against him are **DISMISSED with**

**prejudice**. The motion is **GRANTED** as to Counts III and IV against Mims and

those claims are **DISMISSED with prejudice**. To the extent Plaintiffs' § 1983

malicious prosecution claim (Count I) and claim for attorneys' fees under § 1988

(Count II) against Mims are based on (1) the July 6 arrest warrants against Jerry

Macri, Danny White, Zachary White, Alicia White, and Rebecca Macri, and (2) the

July 11 warrant as to Zachary White, Mims is not entitled to qualified immunity at

this stage and the motion is **DENIED**.[137] Those claims shall proceed to trial.  To

the extent the § 1983 and § 1988 claims against Mims are based on the July 11

warrants against Jerry Macri and Danny White, Mims is entitled to qualified

---

[137] *Kelly*, 21 F.3d at 1546-47 (11th Cir. 1994) (cleaned up) ("A defendant who does
   not win summary judgment on qualified immunity grounds may yet prevail
   on those grounds at or after trial on a motion for a judgment as a matter of law.
   Moreover, a district court can, when needed, use special verdicts or written
   interrogatories to the jury to resolve disputed facts before the judge rules on
   the qualified-immunity question.").

immunity and the motion is **GRANTED**. Mims and Scarbrough's motion for summary judgment is **DENIED** in all other respects.

Brower's motion for summary judgment [ECF 81] is **GRANTED in part and DENIED in part**. The motion is **DENIED** as to Counts I and II against Brower concerning the July 6 arrest warrant for Alicia White and Brower is not entitled to qualified immunity at this stage. The claim shall proceed to trial. Brower's motion is **GRANTED** as to all other claims and Plaintiffs.

Plaintiffs' partial motion for summary judgment [ECF 77] is **DENIED**.

Brower's motion to seal [ECF 83] is **GRANTED**. The Clerk shall place under permanent seal the document filed at ECF 82-1.

A trial date shall be set by separate order. The parties shall file the initial consolidated proposed pretrial order on or before November 1, 2024.

**SO ORDERED** this 30th day of September, 2024.

_____
Steven D. Grimberg
United States District Judge